# IN THE COURT OF APPEALS OF IOWA

No. 21-1745
Filed February 16, 2022

**IN THE INTEREST OF H.K.,**
**Minor Child,**

**A.K., Mother,**
    Appellant.
_____

Appeal from the Iowa District Court for Pottawattamie County, Scott Strait, District Associate Judge.

A mother appeals the adjudication of her child as a child in need of assistance. **AFFIRMED IN PART AND REVERSED IN PART.**

Amanda Heims, Council Bluffs, for appellant mother.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General for Appellee State.

Roberta J. Megel of State Public Defender, Council Bluffs, attorney and guardian ad litem for minor child.

Considered by Bower, C.J., and Greer and Badding, JJ.

**BADDING, Judge.**

In this appeal from an order adjudicating her daughter as a child in need of assistance (CINA), a mother contends that "[p]ure speculation does not equal clear and convincing evidence." Building off that premise, she challenges the evidence supporting the child's adjudication under Iowa Code section 232.2(6)(c)(2), (n), and (p) (2021). We agree the evidence is lacking under section 232.2(6)(p) and accordingly reverse on that ground. But we find clear and convincing evidence establishes adjudication under section 232.2(6)(c)(2) and (n) and affirm the juvenile court's ruling on those grounds.

## I.    *Background Facts and Proceedings.*

When H.K. was born in December 2020, her umbilical cord drug screen was positive for marijuana. An investigation by the Iowa Department of Human Services led to a founded allegation of child abuse against the mother for presence of illegal drugs in the child. When the investigation was conducted, the mother and H.K. were living by themselves in an apartment. H.K.'s father was not involved. The department provided the family with services until March 2021.

In April, the department received a report that the mother was using methamphetamine. The reporting party said the maternal grandmother described the mother as "delusional and hallucinating and thought there were video cameras and microphones in the vents at her home and [the grandmother's] home." The maternal grandmother was providing most of the care for H.K. at the time, although the child was with the mother from April 2 through April 4. When interviewed by the child protective worker, the mother admitted to using methamphetamine three times in one month with her last use on April 10. On that date, the mother "was in

bad shape" from her drug use and had to call the maternal grandmother for help. The mother thought the child's father had poisoned H.K. and insisted on taking her to the doctor. The maternal grandmother drove them to the clinic but would not let the mother go inside with H.K. because she was acting so erratically. Instead, they went to the hospital for the mother because she "insisted her neck was broken" and that she "had parasites in her body." Although a drug screen performed on April 14 was negative for drug use, the sample the mother provided was diluted; a drug patch applied from April 21 to April 28 showed a positive result for methamphetamine.[1] The mother agreed to a safety plan requiring her and the child to live with the maternal grandmother.

While investigating the April report of methamphetamine use, the department received another report alleging the mother "was on PCP on 5/1/21 and that [she] ingested meth that was allegedly put in her coffee." A couple of days later, the mother asked her brother to take her to the emergency room where she told the doctor: "I did some meth last night and I think I got roofied[2] as well. I think I am ODing on something because this isn't how I usually feel after taking meth." Her hospital drug screen was positive for methamphetamine, which she reported using "3-6 [t]imes per [w]eek." The mother stayed in the hospital until May 5. During her time there, she admitted hearing "voices" and having suicidal

---

[1] The child protective worker testified that urinalysis can show a positive result for drug use up to five days prior and patches can show a positive result for up to three days, though it varies depending on the individual.

[2] "Roofie" is a slang term for "a tablet of a powerful benzodiazepine sedative and hyponotic drug . . . that is is not licensed for medical use in the U.S. but is used illicitly." *Roofie*, Merriam-Webster, https://www.merriam-webster.com/dictionary/roofie (last visited Feb. 9, 2022).

thoughts. The department ultimately issued a founded child-abuse assessment for allegations of denial of critical care by failing to provide proper supervision and presence of dangerous substances in the home.[3]

On May 12, the mother completed a substance-abuse evaluation and was diagnosed with moderate alcohol use disorder, moderate stimulant use disorder, and moderate cannabis use disorder. The evaluator recommended that the mother participate in intensive outpatient services. On the same day, the State filed a petition to adjudicate the child a CINA.

For a time, the mother improved. She enrolled in outpatient treatment services on May 20 and tested negative for all substances on May 27. Because she was progressing through outpatient treatment services, a lower level of care was recommended in June. The mother continued to test negative for all substances when screened for drug use in June and in the first two drug screens in July.

But in late July, things changed for the worse. The mother's substance-use counselor reported the mother was hearing voices and expressed concern for her safety. The mother told the maternal grandmother that a cult was "trying to control her and get her to do things, and people are in danger." In the early morning hours of July 30, the maternal grandmother awoke to the sound of the basement door shutting and muffled voices. She went down to the basement to investigate and found a man she did not know sitting in the basement with a full bottle of tequila in front of him and the mother. The maternal grandmother told him to leave. This

---

[3] The mother has appealed this assessment.

"enraged" the mother, who then left with the man. But she soon returned, "pounding on the doors, trying to get in, was yelling, [and] aggressive." The maternal grandmother refused to let her back inside because she "didn't want that behavior with H.K. present." After sleeping for most of the next day, the mother tested positive for alcohol.

On August 3, the mother was arrested for operating a motor vehicle while intoxicated. She was found standing next to her idling vehicle at the entrance of a driveway. When she saw the police, the mother tried to run away but fell down. She was "combative" and kicked the arresting officer several times. The police found a half empty bottle of liquor in her vehicle. The maternal grandmother reported that the mother used alcohol multiple times after these incidences. But the mother told her substance use counselor that she had only used alcohol three times since May, leading to concerns that the mother was not being honest with her providers.

On August 10, law enforcement received a report that the mother had assaulted her sister-in-law, who was supervising the mother and H.K. while the maternal grandmother went on vacation. The mother claimed the sister-in-law had attacked her. The next day, the mother refused a safety plan and asked the caseworker to leave the home. As a result, the child was removed from her care and placed in the care of the maternal grandmother under department supervision.

Due to her mental health, the mother was appointed a temporary guardian on August 13. She completed a mental-health evaluation on August 25 and was diagnosed with major depressive disorder and moderate alcohol use. But in this evaluation, she lied and said that although she had a "history of

[m]ethamphetamine use . . . when she discovered she was pregnant, she stopped using methamphetamine, and has not since." The department referred the mother for a psychological evaluation, which she completed on September 3. She was diagnosed with polysubstance abuse, psychoactive substance-induced psychosis, and a "[s]evere episode of recurrent major depressive disorder, with psychotic symptoms." The doctor who performed the evaluation found that despite the mother's attempts to minimize, "it was easy to see that her thinking was very clearly distorted and thought processes were very tangential at times. [Sh]e did describe some persecut[ory] ideation and delusional beliefs. . . . At this time I think it's in the best interest that she remain having supervised visitation with her daughter."

On September 29, the juvenile court held a hearing on the State's petition. The child's father did not contest the adjudication, although the mother did. The State did not call any witnesses, instead just offering a number of exhibits for the court's consideration. The mother called the child protective worker who completed the child-abuse assessment in May. The worker acknowledged that she did not have "have any direct evidence that [the mother] used substances when she was providing care" for the child. Based on that acknowledgment, the mother moved to dismiss the State's petition. The court denied that motion and found the child to be in need of assistance under Iowa Code section 232.2(6)(c)(2), (n), and (p). The mother appeals.

## II.    Analysis.

Because the "grounds for a CINA adjudication do matter," we examine de novo each of the three adjudicatory grounds challenged by the mother. *In re J.S.*, 846 N.W.2d 36, 40-41 (Iowa 2014). Though we are not bound by the juvenile

court's fact findings, "we do give them weight." *Id.* at 40. Our primary concern is the child's best interest. *Id.*

### A. Iowa Code section 232.2(6)(c)(2).

For an adjudication under section 232.2(6)(c)(2), the State must prove by clear and convincing evidence that a child "has suffered or is imminently likely to suffer harmful effects" as a result of the parent's failure "to exercise a reasonable degree of care in supervising the child." *See In re R.P.*, No. 20-1348, 2021 WL 211624, at *3 (Iowa Ct. App. Jan. 21, 2021). Our supreme court has defined "harmful effects" to mean harm "to the physical, mental or social welfare of a child" and "imminently likely" to include "on the point of happening." *J.S.*, 846 N.W.2d at 42-43.

Citing *J.S.*, the mother argues that methamphetamine use alone does not constitute adjudicatory harm. That case involved a mother with an untreated methamphetamine addiction and a grandparent who was "willing and able to step in and relieve [the mother] of parenting duties when she was not up to the task. As a result, the children were well-groomed, well-dressed, well-fed, and generally well-cared for while at their grandmother's." *Id.* at 42. The supreme court stated, "[W]e do not believe general statements about methamphetamine addiction are enough by themselves to prove that a child is imminently likely to suffer *physical harm* under section 232.2(6)(b)."[4] *Id.* at 42 (emphasis added). But, citing section 232.2(6)(c)(2), the court had "no difficulty concluding . . . that a parent's

---

[4] Section 232.2(6)(b) defines a CINA as one "[w]hose parent, guardian, other custodian, or other member of the household in which the child resides has physically abused or neglected the child, or is imminently likely to abuse or neglect the child."

methamphetamine addiction by itself can result in 'harmful effects' to the child, thereby justifying state intervention to protect the child." *Id.* at 37.

It's true that "the risk of harm may be reduced where another parent or relative can supervise" a child when "a parent is dealing with an untreated addiction." *R.P.*, 2021 WL 211624, at *3. But here, like in *J.S.*, the mother's actions placed H.K. in harm's way despite her efforts to insulate the child. For instance, while high on methamphetamine, the mother insisted on taking H.K. to the doctor because she believed the child had been poisoned. On another occasion when the mother was intoxicated, she brought a strange man into the maternal grandmother's home while H.K. was sleeping and became belligerent when told to leave.

This is not a case where a parent's substance use is an isolated occurrence. *Cf. In re L.L.*, No. 18-0776, 2018 WL 3302163, at *2 (Iowa Ct. App. July 5, 2018) (reversing adjudication under section 232.2(6)(c)(2) where the mother tested positive for methamphetamine during the period just before the child's birth and then provided negative drug screens); *accord In re K.K.*, No. 15-2110, 2016 WL 1703141, at *2 (Iowa Ct. App. Apr. 27, 2016). The mother has a history of substance use. The child tested positive at birth for marijuana, and the mother admitted using methamphetamine several times before the child was six months old. The mother's alcohol use led to her arrest for operating while intoxicated in August 2021, and her preliminary breath test showed a level of intoxication nearly three times the legal limit. And whether due to her substance use or her mental health, the mother was experiencing auditory hallucinations and demonstrated paranoid thinking, which impaired her judgment more than once. Under these

circumstances, we find clear and convincing evidence the child is in need of assistance under section 232.2(6)(c)(2).

### B. Iowa Code section 232.2(6)(n).

Turning next to section 232.2(6)(n), adjudication is appropriate if the "parent's . . . mental capacity or condition, imprisonment, or drug or alcohol abuse results in the child not receiving adequate care." There must be a nexus between the parent's mental health or drug use and the child's receipt of inadequate care. *See In re M.S.*, 889 N.W.2d 675, 682 (Iowa Ct. App. 2016) (explaining drug use standing alone does not establish adjudicatory harm in CINA and termination proceedings). The term "'adequate care' for a child means meeting the child's essential needs. One of those essential needs is a safe home." *In re H.W.*, 961 N.W.2d 138, 144 (Iowa Ct. App. 2021).

Relying again on the care the maternal grandmother provided for H.K., the mother echoes the court in *J.S.*, 846 N.W.2d at 42, in arguing the child was "well-groomed, well-dressed, well-fed, and generally well-cared for" with no evidence "that she was without food, shelter or clothing." But that was only true because of the maternal grandmother's help.

When left to her own devices, the mother abused illegal substances, which led to H.K. testing positive for marijuana when she was born. *See In re J.B.*, No. 21-0241, 2021 WL 1662248, at *3 (Iowa Ct. App. Apr. 28, 2021) (concluding the father's drug abuse resulted in inadequate care based in part on a founded child-abuse report premised on use of an illegal substance in the children's presence). At the time of the adjudication, the mother was unemployed, homeless, and in denial of her substance abuse and mental-health issues. *See In re M.G.*,

No. 03-1587, 2003 WL 22455754, at *2 (Iowa Ct. App. Oct. 29, 2003) (finding adjudication appropriate under section 232.2(6)(n) where the father admitted using methamphetamine and lacked housing and employment). Those issues led to the mother becoming aggressive and violent with her sister-in-law in H.K.'s presence. In the aftermath of that event, the mother refused a safety plan and stopped cooperating with the department. In view of the mother's actions, the child had to be removed from the mother's care to ensure safety. Given all of this, we find clear and convincing evidence establishes the grounds for adjudication under section 232.2(6)(n). *See R.P.*, 2021 WL 211624, at *4 (finding "clear and convincing proof that [the father]'s continued drug use and unwillingness to seek help prevent him from providing adequate care").

### C. Iowa Code section 232.2(6)(p).

This leaves us with section 232.2(6)(p), under which a child may be adjudicated if the parent uses or possesses a dangerous substance, which includes methamphetamine, in the presence of the child or in the child's home. "[I]n the presence of the child" is defined to mean "in the physical presence of a child or occurring under other circumstances in which a reasonably prudent person would know that" the use or possession "may be seen, smelled, ingested, or heard by a child." Iowa Code § 232.2(6)(p). As the State points out, chapter 232 does not define the word "uses." Nor are there any cases defining the word as it is used in section 232.2(6)(p).[5]

---

[5] Indeed, the case law on section 232.2(6)(p) is sparse. A search for that section shows there are only two unpublished cases from our court discussing this ground in appeals from adjudications. *See, e.g., In re E.M.*, No. 20-1722, 2021 WL 811135, at *2 (Iowa Ct. App. Mar. 3, 2021); *R.P.*, 2021 WL 211624, at *4. Neither

In this void, the State advocates for a broad definition of "uses" that "would include both the moment of consumption as well as the period of time immediately thereafter during which the parent is actively under the influence of the substance." Under this definition, the State argues there was clear and convincing evidence that the mother "was using methamphetamine in H.K.'s presence and in her home" because the mother called the maternal grandmother to pick her up on April 10 when she was under the influence of methamphetamine. Since H.K. was with the maternal grandmother at the time, the State asserts the mother used methamphetamine in the child's presence.

We do not think section 232.2(6)(p) can be stretched so far, even with the directive requiring us to liberally construe chapter 232. *See* Iowa Code § 232.1. The interpretation advanced by the State would effectively require us to add the phrase "under the influence" to the statute, which we may not do under our rules of statutory interpretation. *See State v. Alvarado*, 875 N.W.2d 713, 720 (Iowa 2016) (noting that "[n]o court, under the guise of judicial construction, may add words of qualification to" a statute (citation omitted)). And when section 232.2(6)(p) is read as a whole, we believe the legislature intended to cover only the act of consumption in a child's presence or home, not the passive state of being under the influence of a dangerous substance. *See H.W.*, 961 N.W.2d at 143 (stating the meaning of a word cannot be determined in isolation but instead

---

case analyzed the word "uses." *See R.P.*, 2021 WL 211624, at *4 (finding that the State met its burden under section 232.2(6)(p) because the father did "not dispute the State's proof that police found methamphetamine on the premises of the children's home"); *E.M.*, 2021 WL 811135, at *2 (rejecting the father's argument that "there was no proof he ever used illegal substances in the children's presence" because of a positive drug test performed the day after the children's last visit).

must be drawn from the context in which it is used). This is shown by the prefatory language of section 232.2(6)(p), which states a child is in need of assistance when the child's parent "*does* any of the following." (Emphasis added.) Each of the verbs that follow are active verbs—"uses, possesses, manufactures, cultivates, or distributes." Iowa Code § 232.2(6)(p). If the legislature had intended to include periods of time "during which the parent is actively under the influence of the substance," it would have used more passive and expansive verbs like "has used." *See, e.g.*, *De More v. Dieters*, 334 N.W.2d 734, 737 (Iowa 1983) (rejecting the argument that the active "verbs 'sell,' 'give,' and 'supply'" in Iowa Code section 123.47 could encompass the passive acts of allowing or permitting a minor access to alcoholic beverages).

Without that expanded definition, there is not clear and convincing evidence that the mother used methamphetamine in the child's presence. Her positive drug patch came several weeks after she was the sole caretaker of the child. *Cf. E.M.*, 2021 WL 811135, at *2. While that led to a founded child-abuse assessment in May 2021, the mother has appealed that finding. And although the child was born positive for marijuana in December 2020, marijuana is not one of the listed "dangerous substances" for adjudication under section 232.2(6)(p). For these reasons, we conclude the State failed to prove this adjudicatory ground.

### III.     Conclusion.

Upon our de novo review, we affirm the child's adjudication under Iowa Code section 232.2(6)(c)(2) and (n). But we reverse the adjudication under section 232.2(6)(p).

**AFFIRMED IN PART AND REVERSED IN PART.**